UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ROGER COLEMAN,**

    **Plaintiff,**

v.

    Case No. 21-cv-3936
    JUDGE EDMUND A. SARGUS, JR.
    Magistrate Judge Kimberly Jolson

**CORRECTIONS OFFICER**
**LEGMAH,** *et al.***,**

    **Defendants.**

### OPINION AND ORDER

This matter arises on Defendants State of Ohio, Ohio Department of Rehabilitation and Correction ("ODRC"), Pickaway Correctional Institution ("PCI"), ODRC Director Annette Chambers-Smith, ODRC Assistant Director Stuart Hudson, PCI Warden Emma Collins, Lieutenant ("Lt.") Douglas Byrd,[1] and Correction Officer Legmah's (collectively, "Defendants") Motion to Dismiss.[2] (ECF No. 16.) For the reasons stated herein, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART.**

### I. BACKGROUND

**A. Factual Summary**

Plaintiff Roger Coleman has brought a six-count complaint against Defendants, twenty-five unnamed corrections officers, and the Ohio Department of Medicaid related to the alleged actions of Officer Legmah and Lt. Byrd while Mr. Coleman was incarcerated at PCI in July 2020. Mr. Coleman's allegations, taken as true, are as follows:

---

[1] As Defendants note, Plaintiff stylizes Lt. Byrd as Lt. "Burgh" throughout his complaint. (ECF No. 16.)
[2] The only other named defendants not joining this Motion are (1) the Ohio Department of Medicaid and (2) the unidentified "Corrections Officer John and Jane Does 1 to 25" identified in the Plaintiff's Complaint.

1

On July 13, 2020, several months after the start of the COVID-19 pandemic, Mr. Coleman completed a phone call in a common area at PCI. After the call, Officer Legmah, a PCI corrections officer, retrieved a mask for Mr. Coleman after discovering he was not wearing one. At the time Officer Legmah delivered the mask to Mr. Coleman, other inmates were throwing food around in the common area or nearby. Some of this food landed on Officer Legmah. (Compl., ECF No. 1 at ¶¶ 13-15.) Officer Legmah escorted Mr. Coleman out of the common area, toward an open door to the facility's recreation area. Mr. Coleman informed Officer Legmah that Lt. Byrd allowed the inmates to keep the "rec" door open, but Officer Legmah insisted that the door be kept closed. (*Id.* at ¶¶ 15-17.) Mr. Coleman alleges that Officer Legmah was agitated by the thrown food and the open door.

Officer Legmah then pulled his "mace" out and moved it toward Mr. Coleman's face, causing Mr. Coleman to fear that Officer Legmah was going to spray him. Mr. Coleman covered his face with his hands and told Officer Legmah that he could not "mace" him for merely stating what Lt. Byrd had said about the recreation room door. (*Id.* at ¶¶ 18-19, 24.) Mr. Coleman then voluntarily placed his hands against the prison wall to show submission. Officer Legmah then punched Mr. Coleman in the face, causing Mr. Coleman to stumble a few feet away. (*Id.* at ¶¶ 28-29.) Thereafter, Officer Legmah "slammed" a "dazed" Mr. Coleman to the ground, twisted Mr. Coleman's arm, and placed him in handcuffs. (*Id.* at ¶¶ 30-31.) Mr. Coleman complained that the handcuffs were too tight and turned his hands purple due to restricted circulation, but Officer Legmah did not loosen them. (*Id.* at ¶¶ 32-34.) At no point does Mr. Coleman allege Officer Legmah actually "maced" him.

Soon after this episode, Lt. Byrd arrived at the scene. Mr. Coleman told Lt. Byrd that Officer Legmah assaulted him, slammed him to the ground, and handcuffed him without

provocation. (*Id.* at ¶ 35.) Lt. Byrd then locked Mr. Coleman in his cell without calling for medical care. (*Id.* at ¶ 36.) After this, Officer Legmah "repeatedly" approached Mr. Coleman's cell and "laughed" about how there was nothing Mr. Coleman could do about the incident. (*Id.* at ¶ 42.)

Mr. Coleman feared retribution from Officer Legmah for reporting the incident and had trouble eating and sleeping for several days. (*Id.* at ¶¶ 40, 43.) He was "prevented from filing assault charges" and from contacting his family for "days" after the incident. (*Id.* at ¶ 40.)

When Mr. Coleman later reported to the infirmary on an unspecified date, he complained of injuries to his right arm, shoulder, back, and wrists. Ultimately, a nurse "diagnosed red marks" on Mr. Coleman's wrists due to Officer Legmah's handcuff placement. (*Id.* at ¶ 38.) These turned into scars "over one (1) inch" long on both of his wrists. (*Id.* at ¶ 45.) To date, Mr. Coleman suffers "residual anxiety from the incident" and feels residual pain in his face, shoulder, and wrists. (*Id.* at ¶ 44.)

**B. Mr. Coleman's Claims**

Mr. Coleman asserts two claims arising under 42 U.S.C. § 1983 (Counts I and II) against Defendants, as well as four claims under state law. Across Counts I and II, Mr. Coleman alleges, among other things, that Officer Legmah, Lt. Byrd, and "Defendant Pickaway County, Ohio," through their actions and omissions, used "excessive force" and deprived him of privileges and immunities in violation of the Fourth and Eighth Amendments of the United States Constitution. (*Id.* at ¶¶ 50–51, 66.) He further asserts that Defendants maintain "a policy or practice that approves of such unlawful, malicious, and outrageous conduct," and that "Defendants condoned, encouraged, or participated in the alleged conduct against Mr. Coleman[.]" (*Id.* at ¶¶ 71-72.) Alternatively, Mr. Coleman alleges that Defendants generally failed to train PCI corrections

3

officers to engage in "less violent responses" to "inmates talking," and that this "failure to train" amounted to deliberate indifference to the rights of inmates. (*Id.* at ¶ 75.)

Mr. Coleman's first three state-law claims (Counts III-V) are specifically tailored to Officer Legmah, while his fourth and final state-law claim is asserted against all Defendants generally (Count VI). These claims include:

- **Count III**: Intentional Infliction of Emotional Distress
- **Count IV**: Assault
- **Count V**: Battery; and
- **Count VI**: Spoliation of Evidence

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants now move to dismiss all of Mr. Coleman's claims as they pertain to them. (ECF No. 16.)

## II. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Furthermore, "[a]lthough for purposes of a motion to dismiss [a court] must take all the factual allegations in the complaint as true, [it][is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 677–79 (quoting *Twombly*, 550 U.S. at 55) (internal quotation marks omitted).

4

### III. ANALYSIS

Insofar as Mr. Coleman's claims are brought against them in their "official" capacities, Defendants contend they are immunized under the Eleventh Amendment of the United States Constitution. To the extent Mr. Coleman brings his § 1983 or state-law claims against them individually (*i.e.*, in their "personal" capacities), Defendants argue the claims are either insufficiently pled or barred by Ohio Revised Code ("O.R.C.") § 9.86—and, thus, cannot survive dismissal.

By and large, the Court agrees. That is, it finds that all but Mr. Coleman's "personal capacity" § 1983 claim against Officer Legmah (Count I) warrant dismissal.

#### A. "Official Capacity" Claims Against the State, ODRC, and PCI

##### 1. Official Capacity § 1983 Claims (Counts I-II)

Mr. Coleman asserts multiple generalized § 1983 claims against Defendants—which, as noted, include (1) the ODRC, (2) ODRC Director Chambers-Smith and Assistant Director Hudson, (3) PCI, and (4) various PCI officials and employees (*i.e.*, Officer Legmah, Lt. Byrd, and Warden Collins). Insofar as Mr. Coleman brings his § 1983 claims against those individuals in their official capacities, they are to be construed as claims against the state entities those individuals represent—*i.e.*, ODRC and PCI.[3] *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

"The Eleventh Amendment is an absolute bar to the imposition of liability upon a state, its agencies, and its employees sued in their official capacities." *Miles v. Richland Correctional Inst.*, No. 1:14-cv-1648, 2015 WL 366898, at *3 (N.D. Ohio Jan. 27, 2015) (citing *Latham v. Office of*

---

[3] These claims, without explicitly stating as much, sound in *Monell v. Dept. of Social Serv.*, which recognized that "municipalities and other local government units" may be held liable for maintaining an unconstitutional "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. 436 U.S. 658, 690 (1978). But it is well-settled that *Monell* liability is limited to local government entities and does not abrogate the Eleventh Amendment immunity of a state nor its agencies. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989).

5

*Atty. Gen. of State of Ohio*, 395 F.3d 261, 270 (6th Cir.2005)). "The ODRC clearly is a state agency and [is] entitled to Eleventh Amendment immunity." *Id.* PCI, likewise, "is a prison facility owned and operated by the ODRC, and is not a legal entity capable of being sued."[4] *Id.* (collecting cases). Thus, to the extent Mr. Coleman brings Counts I and II against the State of Ohio, the ODRC, PCI, and those agencies' employees in their official capacities, Defendants' Motion to Dismiss is **GRANTED** .

### 2. State Law Claims (Counts III-VI)

Mr. Coleman, as noted, asserts three state-law claims (Counts III-V) against Officer Legmah, and one state law claim (Count VI) against Defendants generally. To the extent Mr. Coleman's state-law claims against Officer Legmah are to be construed as official-capacity claims for damages against the State of Ohio and its agencies, those claims, in addition to his spoliation claim, must overcome Eleventh Amendment sovereign immunity. *See Ernst v. Rising*, 427 F.3d 351, 358-59 (6th Cir. 2005) (citations omitted). They do not.

The Eleventh Amendment of the U.S. Constitution immunizes U.S. states from suit in federal courts. Absent a state's waiver of that immunity, a state is not subject to suit for state-law claims regardless of whether those claims are tied to requests for injunctive or monetary relief. *Id.* at 369 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)). Congress did not abrogate state sovereign immunity in passing 42 U.S.C. § 1983, *Wolfel v. Morris* 972 F.3d 712, 718 (6th Cir. 1992), and that section is not a proper vehicle for bringing state-law tort claims in federal court. *See Baker v. Mcollan*, 443 U.S. 137, 145–46 (1979). Thus, to the extent Mr.

---

[4] Mr. Coleman appears to be under the impression that PCI is operated by Pickaway County, Ohio. (*See* Compl., ECF No. 1 at ¶ 47) (alleging that "[t]he various above captioned corrections officers who interacted [with] and/or treated Mr. Coleman are agents of the Defendant Pickaway County, Ohio acting within the scope and direction of defendant Pickaway County, Ohio"). This is incorrect. PCI—like the ODRC—is a state-run institution, rather than a county entity. *See, e.g.*, *Rucker v. Frazier Health Center*, No. 2:14-cv-411, 2014 WL 660331, at *1 (S.D. Ohio Nov. 19, 2014) (citing *Henricks v. Pickaway Corr. Inst.*, No. 2:08–cv–580, 2009 WL 1322306, * 1 (S.D.Ohio, May 11, 2009)).

6

Coleman brings Counts III-VI against the State of Ohio, its agencies (including PCI), and the individually named defendants noted above in their official capacities, Defendants' Motion to Dismiss is **GRANTED**.

### B. **"Personal Capacity" Claims Against Warden Collins, Director Chambers-Smith, and Assistant Director Hudson**

#### 1. § 1983 Claims (Counts I-II)

"Where a person is named as a defendant without an allegation of specific conduct," the claims against them—even when construed under the most liberal standards—are "subject to dismissal." *Davis v. Mich. Dep't of Corr. Bureau of Health Care Servs.*, No. 2:13-cv-253, 2013 WL 4829977, at *4 (W.D. Mich. Sept. 10, 2013) (citing *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir.2002)). Insofar as Mr. Coleman brings his § 1983 claims against Warden Collins, Director Chambers-Smith, and Assistant Director Hudson (the "State Agency Officials") individually, Defendants argue—and the Court agrees—that this fundamental principle applies.

For liability to attach under a "personal capacity" § 1983 claim, a plaintiff must ultimately prove that a government official "did more than play a passive role" in an alleged constitutional violation (*i.e.*, by offering "tacit approval of the events"). *Salehpour v. Univ. or Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998). At a minimum, he or she must show that the defendant actively "encouraged or condoned [the] alleged constitutional violations." *Id.* at 207. Mr. Coleman's complaint—which fails to even mention the State Agency Officials in its body—does not meet that threshold. Indeed, in the "personal capacity" context, the closest Mr. Coleman comes is his allegation that "Defendants fail[ed] to adequately train their respective correction officers on less violent responses to inmates talking[.]" (Compl., ECF No. 1, at ¶ 75.) But this attempt to attach "supervisory liability" is ill-fated. *See Salehpour*, 159 F.3d 199 at 206 ("[S]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act.").

7

Thus, to the extent Mr. Coleman brings Counts I and II against the State Agency Officials in their "personal" capacities, Defendants' Motion to Dismiss is **GRANTED**.

### 2. Spoliation Claim (Count VI)

As noted, Mr. Coleman brings Count VI—his spoliation claim—against all Defendants. And to the extent it concerns the State Agency Officials, Defendants argue that each official, as a State employee, is immunized under O.R.C. § 9.86, which provides in relevant part:

> Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

Further pointing to O.R.C. § 2743.02(F)—which requires the Ohio Court of Claims (the "Court of Claims") to "first" determine whether an "officer or employee" of the State accused of malicious or reckless conduct is immunized under § 9.86—Defendants contend that Mr. Coleman's "state law claims cannot proceed in this Court unless and until" such a determination has been made as to each of them. (Def's' Mot., ECF No. 16 at PageID #55–56.)

Mr. Coleman, in response, argues that 28 U.S.C. § 1367(a) grants this court supplemental jurisdiction to hear Mr. Coleman's state-law claims, "even if [Defendants] would prefer that Mr. Coleman filed [his action] in Ohio's court of claims." (Pl.'s Resp., ECF No. 17 at PageID #68.) But Defendants' argument is not merely based on a matter of preference, but straightforward caselaw. In other words, it is well-established in this circuit that, when read "in tandem," O.R.C. §§ 9.86 and 2743.02(F) *require* civil claimants like Mr. Coleman to "first" obtain a determination from the Court of Claims that a state employee "is not entitled" to § 9.86 immunity *before* "asserting a cause of action against [that] employee in his individual capacity." *McCormick v.*

8

*Miami Univ.*, 693 F.3d 654, 665 (6th Cir. 2012) (quoting *Haynes v. Marshall*, 887 F.2d 700, 705 (6th Cir. 1989)). And at no point does Mr. Coleman allege (or even argue) that such an immunity determination has been sought or made.

Thus, to the extent Mr. Coleman brings Count VI against the State Agency Officials, Defendants' Motion to Dismiss is **GRANTED**.

### C. Claims Against Officer Legmah and Lt. Byrd

#### 1. § 1983 Claim Against Officer Legmah (Count I)

Mr. Coleman's personal-capacity § 1983 claim against Officer Legmah centers on the alleged punching-and-handcuffing incident that underpins his suit. To survive, this claim—as with Mr. Coleman's § 1983 claim against Lt. Byrd—must overcome the doctrine of qualified immunity. And at this stage, it does.

A government official is entitled to qualified immunity from a § 1983 claim unless (1) he or she "violated a constitutional right;" and (2) that right "was clearly established" at the time of violation. *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" if "the contours of the right [are] sufficiently clear [so] that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("the unlawfulness must be apparent").

Mr. Coleman initially alleges that Officer Legmah violated two of his constitutional rights: (1) his Fourth Amendment right to be free from "excessive force," and (2) his Eighth Amendment right to be free from "cruel and unusual punishment." (Compl., ECF No. 1 at ¶¶ 56, 66.) Notwithstanding this two-pronged approach, he focuses the entirety of his § 1983 briefing as it

9

relates to Officer Legmah on the Eighth Amendment. (Pl.'s Resp., ECF No. 17 at PageID #68.) So, the Court will cabin its focus there.[5]

The Eighth Amendment prohibits prison guards from subjecting inmates to "inhumane" conditions or "excessive physical force." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Here, to sufficiently establish an Eighth Amendment violation, Mr. Coleman's allegations, on their face, must show that Officer Legmah applied force "maliciously and sadistically for the very purpose of causing harm." *Id.* at 835–836 (quoting *Hudson v. McMillan*, 509 U.S. 1, 6 (1992); *see also* Cornwell v. Dahlberg, 963 F.2d 912, 918 (6th Cir. 1992). To meet that burden, Mr. Coleman points to several aspects of Officer Legmah's alleged behavior—namely, his (1) threat to spray him with mace, (2) punching of Mr. Coleman in the face "[w]ithout any provocation," and (3) use of handcuffs "so tight that Mr. Coleman's hands turned purple from lost circulation," an act which ultimately left multiple scars on his wrists. (Compl., ECF No. 1 at ¶¶ 18, 28-30, 32, 45.) The Court considers each of these overarching allegations in the context of the qualified immunity framework.

### a. *Threat of Using Mace*

A prison guard's use of a chemical agent on a prisoner "in a good-faith-effort to maintain or restore discipline"—even when that prisoner simply "question[s]" a direct order—does not run astray of the Eighth Amendment. *Jennings v. Peiffer*, 110 Fed. App'x 643, 646 (6th Cir. 2004). Here, Mr. Coleman does not even allege that Officer Legmah *used* a chemical agent on him; he merely alleges that Officer Legmah moved the mace toward Mr. Coleman in such a way that made

---

[5] The Fourth Amendment protects a person's right to be free from "unreasonable seizures," including the right to be free from excessive force by police during a seizure. *Graham v. Connor*, 490 U.S. 386, 394–97 (1989). In some situations, the Fourth Amendment's protections against excessive force may extend to people held in detention prior to conviction. *See id.* at 395 n.10. At no point does Mr. Coleman argue or allege he was a "pretrial detainee" at the time of his encounter with Officer Legmah. Nor does it naturally follow from his complaint that this was case. Thus, in this context, the Fourth Amendment is of seemingly limited relevance.

Mr. Coleman fear that it *would* be used. As far as this Court can tell, there is no case setting forth a "clearly established right" to be free from such a threat. Thus, this portion of Mr. Coleman's narrative does not surmount qualified immunity.

### b. Punching Mr. Coleman in the Face Without Provocation

The same cannot be said for Officer Legmah's alleged use of physical force. Taking Mr. Coleman's perspective as true, and absent other facts contradicting his account, there is little justification for Officer Legmah to have punched Mr. Coleman in the face forcefully enough to cause him "to stumble a few feet away from the location where the punch occurred." (Compl., ECF No. 1 at ¶ 29.) Although prison guards generally are permitted to use appropriate force in response to prisoners' questioning or otherwise defying their direct orders, Mr. Coleman alleges that he merely commented about a disagreement over a door policy and moved to protect himself from Officer Legmah's mace before the punch occurred. This account presents a plausible instance of "sadistic" or "malicious" physical force. *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (noting that the "core judicial inquiry" of an excessive force claim asserted under the Eighth Amendment was "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"). Moreover, Officer Legmah was on notice that he is not permitted to deploy direct physical force in this manner on an inmate who did not disobey him nor display any threat of disorder. *See, e.g.*, *id.*

All told, at this stage, Officer Legmah is not entitled to qualified immunity for this alleged act. For that reason, Mr. Coleman's "personal capacity" § 1983 claim against him survives.

### c. Excessively Tight Handcuffs

A claim of excessively forceful handcuffing will survive dismissal if the plaintiff offers "sufficient evidence . . . that: (1) he or she complained the handcuffs were too tight; (2) the officer

11

ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Baynes v. Cleland*, 799 F.3d 600, 608 (6th Cir. 2015) (citations omitted). Mr. Coleman's complaint, on its face, meets these criteria. That is, as alleged, Mr. Coleman *did* complain that Officer Legmah's handcuffs were so tight they were cutting off circulation to his hands; that Officer Legmah ignored this plea; and that the event ultimately inflicted long-lasting pain to both of his wrists. (Compl., ECF No. 1 at ¶¶ 32-34, 44–45.) Thus, on this basis alone, Mr. Coleman's "personal capacity" claim against Officer Legmah may proceed.

Accordingly, insofar as it concerns Mr. Coleman's "personal capacity" § 1983 claim against Officer Legmah (Count I), Defendants' Motion to Dismiss is **DENIED**.

### 2. § 1983 Claim Against Lieutenant Byrd (Count I)

Mr. Coleman asserts that Lt. Byrd was "deliberately indifferent" to the injuries he allegedly suffered at the hands of Officer Legmah, thereby violating the Eighth Amendment. (Compl., ECF No. 1 at ¶ 68.)

To assert a cognizable Eighth Amendment claim, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). This deliberate indifference analysis contains both subjective and objective components. The objective component requires the plaintiff to assert "sufficiently serious" medical needs. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "The subjective component, in contrast, requires a plaintiff to 'allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" *Dominguez*, 555 F.3d at 550 (citing *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837)).

12

Mr. Coleman meets neither criterion here. That is, he fails to state a "plausible" claim that Lt. Byrd "deliberately" disregarded a *substantial* risk to Mr. Coleman's health. Without explaining when and in what manner Lt. Byrd arrived on the scene, Mr. Coleman merely states that Lt. Byrd "asked Mr. Coleman what had happened" after his incident with Officer Legmah. (Compl., ECF No. 1 at ¶ 35.) Mr. Coleman told Lt. Byrd that Officer Legmah "assaulted" him, slammed him to the ground, and handcuffed him "without any provocation." (*Id.* at ¶ 35.) Mr. Coleman alleges thereafter that Lt. Byrd "denied [his] requests for medical attention" and locked Mr. Coleman in his cell without ensuring he received medical care or calling for medical assistance. (*Id.* at 36.) He then states he "was allowed to present to the infirmary" at an unspecified time and received medical attention from a nurse. (*Id.* at ¶ 37–38.)

Mr. Coleman does not describe what medical attention he requested, how long he waited before was "present[ed] to the infirmary," or, most notably, how his medical needs—which generally consisted of a "pain in his face, shoulder, and wrists"—were "sufficiently serious." *See Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004). At the time, the only physical manifestations of these injuries appear to have been "red marks" on his wrists. (Compl., ECF No. 1 at ¶¶ 38.) This "superficial, nonserious condition"—even when supplemented by Mr. Coleman's requests to go to the infirmary—hardly constitutes the type of "objectively serious" injury necessary to sustain a "deliberate indifference" claim. *See id.* at 897-900 (noting that, in the absence of "verifying medical evidence," a plaintiff's injury must be "so obvious that even a layperson would easily recognize the *necessity* for a doctor's attention" to give rise to a "deliberate indifference" claim) (emphasis added) (citations omitted); *accord Murai v. Adduci*, 461 F. Supp. 3d 599, 606 (E.D. Mich. 2020). To that extent, Mr. Coleman has failed to allege facts from which

13

this Court could "plausibly" infer that Lt. Byrd deliberately ignored a substantial risk to Mr. Coleman's health.

Thus, to the extent it concerns Mr. Coleman's "personal capacity" § 1983 claim against Lt. Byrd (Count I), Defendants' Motion to Dismiss is **GRANTED**.[6]

### 3. State-Law Claims Against Officer Legmah and Lt. Byrd

Mr. Coleman, as noted, brings all or some of his four state-law claims (Counts III-VI) against Officer Legmah and Lt. Byrd. (Compl., ECF No. 1 at ¶¶ 81-121.) But as discussed, for these claims to proceed, Mr. Coleman must obtain a determination from the Ohio Court of Claims that both "employees" are not immunized by O.R.C. § 9.86. And again, at no point does Mr. Coleman allege that he sought or obtained such a determination. Thus, Counts III-VI cannot survive, *Haynes* 887 F.2d at 704; *see also McCormick*, 693 F.3d at 664–665, and Defendants' Motion to Dismiss as to those claims is **GRANTED**.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss. (ECF No. 16.) Specifically, the Court **GRANTS** Defendants' motion in all respects save for Count I to the extent it asserts a "personal capacity" § 1983 claim against Officer Legmah. All other claims against Defendants are **DISMISSED**, and the State of Ohio, Ohio Department of Rehabilitation and Correction, Pickaway Correctional Institution, Lt. Byrd (stylized as "Burgh"), Warden Collins, Director Chambers-Smith, and Assistant Director Hudson are hereby **TERMINATED** as defendants in this suit.

---

[6] Mr. Coleman, who is represented by counsel, has not asked for leave to amend this portion of his complaint (or the portions pertaining to the other defendants discussed herein). Nor is this Court inclined to permit such an amendment *sua sponte*. *See Brown v. Matauszak*, 415 Fed. App'x 608, 616 (6th Cir. 2011) ("[A] a district court does not abuse its discretion in failing to grant a party leave to amend where such leave is not sought."). Were it to appear that "information . . . that would cure the defect in [Mr. Coleman's] complaint" existed, the Court would likely be more forgiving. *See id.* But that is not the case here, as Mr. Coleman's alleged injuries, even construed favorably, did not cross the threshold of a "substantial health risk."

14

This case shall remain open.

**IT IS SO ORDERED**.


**9/23/2022**                                          **s/Edmund A. Sargus, Jr.**
**DATE**                                            **EDMUND A. SARGUS, JR.**
                                                     **UNITED STATES DISTRICT JUDGE**